COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Causey and White
Argued at Alexandria, Virginia

ANTHONY TERRELL DYESS

                                                           MEMORANDUM OPINION* BY

v.        Record No. 1726-23-4                       JUDGE RANDOLPH A. BEALES
                                                       JANUARY 13, 2026

CATHERINE ELAINE DYESS


FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Victoria A. B. Willis, Judge

James J. O'Keeffe (E. Kyle McNew; Christopher Janszky; A. Lewis
Lowery; MichieHamlett PLLC, on briefs), for appellant.

Brandy M. Poss (Barnes & Diehl, P.C., on brief), for appellee.


Following a bench trial, the Circuit Court of Stafford County entered a final decree of

divorce, granting Catherine Elaine Dyess ("wife") a divorce *a vinculo matrimonii* from Anthony

Terrell "Terry" Dyess ("husband") on the grounds of adultery pursuant to Code § 20-91(A)(1).

On appeal, husband assigns error to the circuit court's award of spousal support and equitable

distribution of the business he founded during the marriage.  Husband also argues that the circuit

court erred by denying his motions to reconsider and to reopen the evidence.  Wife assigns

cross-error to the circuit court's findings that two bank accounts, a catamaran, and a condo were

husband's separate property and requests attorney fees on appeal.

## I.  BACKGROUND

"When reviewing a [circuit] court's decision on appeal, we view the evidence in the light

most favorable to the prevailing party, granting it the benefit of any reasonable inferences."

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

*Wolfe v. Shulan Jiang*, 83 Va. App. 107, 111 (2025) (alteration in original) (quoting *Nielsen v. Nielsen*, 73 Va. App. 370, 377 (2021)).

Husband and wife married in 1992, and they had three children, all of whom are now adults. Early in the marriage, husband served in the United States Air Force, and while he was in the Air Force, he completed two master's degrees. Wife had a bachelor's degree in social work and briefly operated a home daycare to supplement the family's income, but otherwise did not work. Wife was the primary caregiver for the couple's children and was responsible for "homemaker duties" such as maintaining the home, purchasing groceries, preparing meals, and taking the children to school.

The family moved several times for husband's military career, and in 2005, husband was assigned to the Pentagon. The couple purchased a home, and the family settled in Fredericksburg.

In 2006, wife discovered that husband had had an extramarital affair. The affair strained the marriage, but the couple did not separate.

In 2010, husband retired from the Air Force to work in consulting. The couple had been married for 18 years when husband retired, two years short of the 20 years required for wife to qualify for lifetime medical benefits as a 20/20/20 spouse.[1] After leaving the military, husband received military retirement and disability pay in addition to his civilian salary, and the family's standard of living greatly increased. The couple paid off all debt other than the mortgage, purchased cars for their children, paid for their children's college tuitions, went on several family vacations abroad, and made large charitable donations to their church.

---

[1] An unremarried former spouse of a service member who was "married to the member or retired member for a period of at least 20 years," whose servicemember spouse had at least 20 years of military service, and whose marriage overlapped with that period of military service by at least 20 years, qualifies as a 20/20/20 spouse and is entitled to certain benefits, including lifetime medical benefits. 32 C.F.R. § 161.19 (2025). *See also* 10 U.S.C. § 1072(2)(F).

In August 2015, husband left his consulting job to start 3Gimbals, LLC, a government contracting company. In October 2016, husband informed wife that 3Gimbals had won a six-month contract in Miami and that he was moving there temporarily. Husband left the marital home on October 12, 2016, but he returned to visit for Thanksgiving and Christmas that year. In late December 2016, husband set up a Tinder account to "start dating again." In early January 2017, he met and began messaging a woman on Tinder. They began a sexual relationship which lasted a year. On February 15, 2017, husband emailed wife, telling her that he wanted a divorce.

In June 2018, wife filed for divorce on grounds of abandonment, adultery, or in the alternative, separation of one year. She requested equitable distribution and spousal support both *pendente lite* and permanently. Husband filed an answer and cross-complaint seeking a divorce based on a separation of one year.[2]

In August 2020, husband moved the court "to permit the parties to submit evidence" of alternate valuation dates of his businesses.[3] He argued that setting the value of his businesses as of the date of the evidentiary hearing would "not accurately or adequately reflect" the personal or financial contributions made by the parties. Although husband indicated that the parties had retained an expert to conduct business valuations reflecting multiple dates, he did not request that the circuit court use any specific valuation date.

Before trial, the parties each filed equitable distribution worksheets listing their assets and proposing their own classifications of those assets. Wife listed the couple's joint USAA checking account x8469 as marital property. She alleged that some of husband's separately titled bank accounts were marital property, including USAA account x1035 and two Navy Federal Credit

---

[2] Husband later amended his cross-complaint to alternatively seek a divorce on the grounds of wife's "constructive" desertion.

[3] The motion referred to husband's "two businesses," but does not specify which businesses.

Union bank accounts (NFCU accounts x5697 and x7845[4]).  She listed two condos in Miami (Unit 1535 and Unit 1216) as marital property.  Wife listed two boats—a sailboat and a catamaran—as marital property.[5]  Husband listed the joint USAA checking account as marital property, but he stated that the other separately titled bank accounts, the two Miami condos, and the two boats were his separate property.

On June 23, 2021, the parties appeared before the circuit court for a trial on the grounds for divorce, the couple's date of separation, spousal support, and equitable distribution.[6]

### A.  Spousal Support

At trial, husband's attorney stipulated that husband had the ability to pay "any foreseeable, reasonable" award, emphasizing that there was no need to present evidence on husband's ability to pay.  Husband stated repeatedly throughout his testimony that he did not dispute his ability to pay.

Both parties testified that husband paid wife $874 per month post-separation.  Wife testified that husband paid the mortgage and most of the bills.  Wife testified that husband's monthly $874 payment was for expenses "over and above" his payments of the bills.  Wife also testified that these payments were often insufficient to cover her expenses and that she received substantial financial assistance from their daughter.  Wife testified that her standard of living had declined post-separation and that she had to maintain a "very strict budget" and could no longer afford to travel or to do other things she "used to do."  Husband testified that he enjoyed a higher standard of

---

[4] The parties' equitable distribution worksheets indicated that these NFCU accounts were business accounts that were associated with the entity Nach Hause, LLC and owned entirely by husband.

[5] Wife initially filed an equitable distribution worksheet that did not assign the sailboat or catamaran a classification as either marital or separate assets.  Wife amended her equitable distribution worksheet before trial, listing both as marital assets.

[6] The grounds for divorce and the date of separation are not the subject of this appeal.

living post-separation, including regular travel, dining out, and buying expensive jewelry for his current girlfriend.

## B. Equitable Distribution

### 1. Valuation of 3Gimbals

The trial court heard evidence from three experts about the value of 3Gimbals. William Dacey, a certified public accountant, was jointly retained by husband and wife. His report was entered into evidence at trial as a joint exhibit. He conducted a valuation of 3Gimbals on three separate dates requested by husband. Dacey determined that 3Gimbals' value was $189,000 on October 12, 2016, $375,000 on February 15, 2017, and $4,981,000 on December 18, 2020.

Robert Raymond, a certified public accountant retained by husband, testified about the classification of the post-separation increase in 3Gimbals' value. Raymond testified that he reviewed Dacey's reports and used them to calculate the company's post-separation increase in value. Using Dacey's valuations, Raymond subtracted the company's value on husband's alleged separation date of October 12, 2016[7] from its value as of December 2020, resulting in a post-separation increase of $4,792,000. Raymond testified that between 5% and 15% of 3Gimbals' $4,792,000 increase in value should be classified as marital property, with the remainder being classified as husband's separate property. In his report, Raymond explained that he considered husband's post-separation personal effort in calculating what portion should be husband's separate property. Among other factors, Raymond considered certain "[p]ersonal attributes" of husband as part of his personal effort, including husband's "status as a service disabled veteran that qualifies [3Gimbals] for contract bidding preference and his top-secret security clearance." According to Raymond, those attributes "contributed materially to the success of 3Gimbals."

---

[7] Raymond also calculated the post-separation increase in value using wife's proposed separation date of February 15, 2017.

Lawrence Schwartz, a certified public accountant retained by wife, reviewed Dacey's valuation of the company. In his report, Schwartz generally agreed with Dacey's approach, but testified that the company was valued at $6,070,000, in December 2020. Out of this amount, Schwartz calculated the overall goodwill in the company as of December 2020 at $339,000. Schwartz explained that a party's personal goodwill in a company is a separate property interest, which cannot be subject to equitable distribution. On the other hand, institutional goodwill is "attributable to the business itself" and is marital property. Out of the total goodwill, Schwartz opined that $213,600 was husband's personal goodwill, and the remainder of the $339,000 was the company's institutional goodwill.

Husband testified that 3Gimbals had continued to make more money during each year of operation. However, husband testified, "We've made more money each year, that's right, and we are very close to dead now." He explained that five of 3Gimbals' contracts would expire or lose funding within the year. Several 3Gimbals employees testified, agreeing that the company faced challenges, but expressing optimism for the company's future. Husband indicated that he believed the appropriate valuation date for 3Gimbals should be October 12, 2016, the day he left for Miami, which he argued was the parties' date of separation.

*2. Commingling and Transmutation of Funds*

Wife produced bank statements for the couple's joint USAA checking account x8469 and for husband's separately titled USAA account x1035 from May through September 2018. The bank statements showed that the couple's joint checking account had a starting balance of $60,505.28 in May 2018. Husband then began transferring funds from the joint account to his separately titled USAA account. In June, July, and August 2018, husband transferred sums of $34,344.66, $13,962.18, and $3,926.90, respectively, from the joint account to his separately titled account. Husband had not told wife that he was going to withdraw those funds from the joint account.

- 6 -

Until July 2018, husband deposited his paychecks from 3Gimbals, his military retirement, and disability pay into the joint USAA account. In August 2018, he began depositing his 3Gimbals paychecks in his separately titled USAA account. Husband admitted to transferring funds from the couple's joint account into his separately titled account but explained that he did so on the advice of his attorney at the time, who advised him to "split it half in two, take some and put in my account and leave the other half and put in Catherine's account." Husband also started paying all of the couple's bills out of his separately titled account. He testified that his attorney had advised him to stop depositing his post-separation earnings into the joint account.

Husband purchased a sailboat in February 2018 for $14,950. He explained that he used funds from 3Gimbals in the form of a loan to make that purchase of the sailboat. In September 2018, husband made a downpayment of $135,982.35 on a condominium, Unit 1535 in Miami, Florida, and husband acknowledged in his later filed motion to reconsider that he used funds to purchase Unit 1535 that "flowed through the joint account."

Husband entered bank statements from his separately titled NFCU accounts x5697 and x7845 into evidence. Husband testified that he did not open the NFCU accounts until after the parties' separation—and that he did not transfer any money from marital funds into those accounts. The bank statements showed that husband withdrew $590,000 from NFCU account x7845 in August 2019. Husband explained that those funds came from distributions that were compensation for him from 3Gimbals that he had deposited in the NFCU account. Husband then used the 3Gimbals distributions to purchase another condominium in the same building, Unit 1216, in September 2019 for $561,000. Husband testified that he also purchased the catamaran for $905,000 in August 2020 using distributions that were compensation for him from 3Gimbals.

On March 24, 2022, by letter opinion, the circuit court found that "The preponderance of the credible evidence supports the finding of separation as February 15, 2017, when Husband actually notified Wife in writing of his intent to divorce." The circuit court held that wife had presented "clear and convincing evidence of adultery," and granted wife a divorce on those grounds.

In calculating a spousal support award, the circuit court considered each of the statutory spousal support factors in Code § 20-107.1(E). The circuit court observed that husband's decision to retire from the military before wife qualified as a 20/20/20 spouse left her without the lifetime health benefits she would have received if husband had remained in the military. The circuit court also recognized that "Wife's non-monetary contributions were significant and enabled Husband to advance at work and to secure additional degrees." The circuit court noted that "Husband has a significant earning capacity and Wife has an extremely limited earning capacity." The circuit court also noted the extent to which husband's adultery had contributed to the dissolution of the marriage—and further noted husband's dissipation of marital assets because "Husband engaged in extravagant purchases (100 red roses, boats and condos)[,] took expensive trips[,] and lavished his paramour with expensive jewelry." After considering all the evidence, the circuit court awarded wife $6,000 per month in spousal support retroactive to the date she filed for divorce.

Regarding equitable distribution, the circuit court considered each factor in Code § 20-107.3(E), including wife's non-monetary contributions to the family, her lack of work experience, husband's infidelity, and his "rich lifestyle while Wife lived on $800 a month." The circuit court specifically considered husband's pattern of using funds from the joint account while in Miami building 3Gimbals, which "demonstrates his reliance on these funds for his new business."

In determining the equitable distribution of 3Gimbals, the circuit court considered the three experts' opinions, and the three valuation dates. The circuit court noted that in addition to Dacey's valuation, wife's expert Schwartz "opined Husband's interest as of December 2020 was $6,069,000," whereas husband's expert Raymond concluded that between "50 to 15% of post-separation increase was marital."[8] The circuit court specifically recognized wife's "contribution to the success of this venture by supporting Husband's career for more than twenty years." The circuit court found that wife was "entitled to an award of 1.2 million," but then actually awarded her 15% of 3Gimbals' total value of $6,069,000, which actually resulted in an award of only $910,350.

The circuit court found that husband made a "pattern of withdrawals" of his post-separation 3Gimbals salary from the joint bank account and deposited them into his separately titled account. The circuit court concluded that by commingling separate and marital funds, those separate funds were transmuted into marital property. The circuit court also held that Unit 1535 was marital property because husband had commingled his post-separation 3Gimbals salary with marital funds, and had failed to prove by a preponderance of the evidence that the funds used to purchase Unit 1535 were retraceable to his separate property. Similarly, the circuit court classified the sailboat as marital property because husband had also purchased it using commingled funds from his separately titled USAA account. The circuit court ordered husband to pay wife half of the value of the sailboat and half of the equitable value of Unit 1535. Finally, the circuit court found that NFCU accounts x5697 and x7845, the condominium that is Unit 1216, and the catamaran were husband's separate property.

---

[8] Raymond had opined to a percentage between *5%* and 15% percent, not 50% and 15%. The record is not clear whether this was simply a typographical error by the trial judge in her March 24, 2022 letter opinion. Nonetheless, it does not appear that the circuit court relied on Raymond's opinion in calculating the award, given that it agreed with the valuation of wife's expert.

After the circuit court issued the first letter opinion on March 24, 2022, the parties jointly moved for clarification. In response, the circuit court issued another letter opinion on June 27, 2022, describing its original calculation in distributing 3Gimbals as "completely inaccurate." Accepting the valuation of wife's expert,[9] the circuit court found that 3Gimbals had a total value of $6,070,000. The circuit court subtracted $213,600 of personal goodwill attributable to husband because personal goodwill is his separate property—leaving a marital share of $5,856,400. In distributing that marital share, the circuit court considered husband's decision to retire from the military early, depriving wife of lifetime health benefits, husband's reliance on marital funds during the early phase of establishing 3Gimbals, and husband's continued use of marital funds while living in Miami. The circuit court awarded wife 35% of what the court said was the marital share of 3Gimbals—or $2,124,500. However, $2,124,500 is 35% of $6,070,000—not 35% of $5,856,400—which is instead $2,049,740, which results in a difference in the award to wife of almost $75,000. Nevertheless, husband did not ever bring this specific apparent mistake in the circuit court's calculations to the *circuit court's* attention—and also has not made this specific argument to this Court on appeal (i.e., that the circuit court's error resulted in wife's receiving almost $75,000 more than she should have received in the distribution of the marital portion of 3Gimbals).

On March 14, 2023, the circuit court entered a final order of divorce. The order gave husband 180 days to pay wife $170,000 for her share of Unit 1535, $2,124,500 for her share of 3Gimbals, and $7,475 for her share of the sailboat.[10] The court also held that husband owed

---

[9] The circuit court mistakenly referred to wife's expert as "Dacey." The numbers that the circuit court used in calculating the revised award were consistent with the opinion of wife's expert, Schwartz.

[10] Other awards in the order, such as distribution of the couple's bank accounts and retirement, had a 30-day deadline. The court also ordered the parties to put the Fredericksburg home on the market within 60 days.

$312,000 in spousal support arrearages. One week later, both parties moved for reconsideration, and the court suspended the final order of divorce.

Husband moved to reconsider on several grounds, challenging the circuit court's valuation and distribution of 3Gimbals. Husband also asked the circuit court to reconsider its transmutation analysis, and to reconsider its retroactive spousal support award, arguing that he had voluntarily supported wife by paying her $874 per month. In his motion, husband admitted that the funds he used for the down payment on Unit 1535 "flowed through the joint account."

Husband also moved to reopen the evidence so he could introduce evidence to trace his separate funds that the circuit court had found to be commingled and to introduce additional evidence of 3Gimbals' current financial state. Wife also moved to reconsider, arguing that the circuit court improperly classified NFCU accounts x5697 and x7845 and the catamaran as husband's separate property.

The circuit court denied husband's motion to reopen the evidence, explaining that husband had had "ample time and opportunity" to introduce evidence on the classification of his separately titled property at trial.[11] Regarding husband's motion to reconsider, the circuit court noted that the party moving for an alternative valuation date bears the burden to show good cause for using that date. The circuit court found that despite moving for an alternative valuation date before trial, husband never asked the circuit court to use any *specific* alternative date. The circuit court explained that it had considered the various valuation dates provided in the record and had selected the valuation "closest to the trial date." Regarding spousal support and husband's request to be credited for voluntary support payments, the circuit court found insufficient evidence in the record to calculate such credits accurately and that "[i]t would be impossible for the Court to correctly

---

[11] The circuit court did not specifically address husband's request to reopen the evidence related to 3Gimbals' current financial situation.

- 11 -

calculate exactly what amounts were in fact paid for what bills." The circuit court also denied husband's request to reconsider its transmutation analysis, holding that the burden was on husband to present evidence tracing those funds, because husband was the party asserting that the funds were separate. The circuit court similarly denied wife's motion to reconsider, reaffirming its earlier decision that the NFCU accounts and the catamaran were husband's separate property. Accordingly, the circuit court denied both parties' motions to reconsider and lifted its suspension on the finality of the divorce decree. Husband now appeals to this Court.[12]

## II. ANALYSIS

### A. Spousal Support

In his first assignment of error, husband argues, "The trial court erred by granting Catherine spousal support retroactive to June 2018 without giving Terry any credit for amounts he'd voluntarily paid in the interim."

"A trial court has broad discretion in setting spousal support and its determination will not be disturbed except for a clear abuse of discretion." *Nielsen*, 73 Va. App. at 390 (quoting *Robinson v. Robinson*, 50 Va. App. 189, 194 (2007)). "In other words, '[w]e will reverse the trial court only when its decision is plainly wrong or without evidence to support it.'" *Payne v. Payne*, 77 Va. App. 570, 591 (2023) (alteration in original) (quoting *Gamble v. Gamble*, 14 Va. App. 558, 574 (1992)).

### 1. Retroactive Spousal Support

Husband argues that the trial court erred by "awarding retroactive spousal support."

A circuit court has "discretion to enter the award of spousal support effective any time after the date of the commencement of the suit." *Konefal v. Konefal*, 18 Va. App. 612, 614 (1994) (citing *Young v. Young*, 215 Va. 125, 126 (1974)). The circuit court considered the factors enumerated in

---

[12] In addition, wife assigns cross-error to the circuit court's classifications of certain assets.

Code § 20-107.1(E) and included factual findings regarding each factor in its letter opinion. The circuit court stated that it based its award on "the duration of the marriage, Wife's monetary and non-monetary contributions, respective earning potentials of each spouse moving forward, and weighing Husband's age, conduct that contributed to the dissolution of the marriage, dissipation of the marital assets prior to divorce and dissipation of the parties' marital assets post separation." Based on this evidence, we simply cannot say that the circuit court's decision to award retroactive spousal support was plainly wrong or without evidentiary support.

Husband also argues that the circuit court erred in finding that wife "lived on $800 a month to pay all bills" when he paid wife $874 per month in addition to paying most of her bills. "Appellate courts do 'not fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied.'" *Vay v. Commonwealth*, 67 Va. App. 236, 253 (2017) (quoting *Yarborough v. Commonwealth*, 217 Va. 971, 978 (1977)). For one, the circuit court made this finding when examining the statutory factors for equitable distribution, not spousal support. Furthermore, the circuit court was evaluating the "stark contrast" in husband and wife's post-separation standards of living. Given the record evidence of husband's luxury purchases, extensive travel, and dining out, the circuit court's findings are not plainly wrong or without evidentiary support.

*2. Credits for Voluntary Payments*

Husband further argues that the trial court erred by "failing to give Appellant a credit for the support that he had voluntarily paid since the parties separated."

Wife testified that after separation, husband paid the mortgage and most of the bills. Both parties also agreed that husband paid wife $874 per month post-separation. Wife testified that these payments were in addition to the bills that husband paid.

The circuit court did not err when it held that the record lacked sufficient evidence of the total specific amount that husband paid to wife after separation, nor did it err when it found that it was "impossible for the Court to correctly calculate exactly what amounts were in fact paid for what bills." Neither party testified about the exact amount of the bills that husband paid nor presented evidence of specific payments husband made for wife's benefit for which he should be credited (other than the $874 per month payments). Indeed, rather than requesting credits in his closing argument, husband only raised the question of credits in his motion for reconsideration, which the circuit court denied. He did not provide evidence of even exactly how many months he made the voluntary $874 per month payments, nor did he provide the circuit court with a specific total amount of credit that he was seeking.

Finally, husband provides no binding Virginia caselaw or statutory authority for his contention that the circuit court was required to credit him for payments he voluntarily made to wife. Assuming without deciding that the circuit court was required to give him such a credit if properly and adequately pled, husband has not provided the circuit court or this Court with a total amount for which he is seeking credit. In fact, husband did not even provide the circuit court with the number of months he made these $874 payments (or how many mortgage payments he paid or the total amount of the marital bills he paid). Nor did he introduce adequate evidence that would enable the circuit court to accurately calculate such a credit with any assurance. In short, husband has failed to support his argument on appeal challenging the circuit court's decision to deny his request for credits for previous payments that he made for wife's support.

## B. Equitable Distribution

In his second assignment of error, husband argues, "The trial court erred in its equitable distribution of the parties' property." He argues the trial court erred on two grounds. First, "The

- 14 -

trial court erred in its valuation and distribution of 3Gimbals, LLC." Second, "The trial court erred in its commingling and transmutation analysis."

"Because making an equitable distribution award is often a difficult task, 'we rely heavily on the discretion of the trial judge in weighing the many considerations and circumstances that are presented in each case.'" *Sobol v. Sobol*, 74 Va. App. 252, 272 (2022) (quoting *Howell v. Howell*, 31 Va. App. 332, 350 (2000)). This Court will not overturn a circuit court's equitable distribution award unless we find "an abuse of discretion, misapplication or wrongful application of the equitable distribution statute, or lack of evidence to support the award." *Id.* (quoting *Dixon v. Dixon*, 71 Va. App. 709, 717-18 (2020)). The circuit court's "discretion is limited only in that the circuit court must consider all of the factors in Code § 20-107.3(E)." *Fadness v. Fadness*, 52 Va. App. 833, 842 (2008). "If the circuit court considers all the factors and bases its findings on credible evidence, we will not disturb its decision on appeal." *Id.*

### 1. Valuation and Distribution of 3Gimbals

Husband argues, "The trial court erred in its valuation and distribution of 3Gimbals, LLC." He also argues, "The lower court should have valued 3Gimbals as of the date of separation."

"On appeal, we review the [trial] court's determination of a valuation date for abuse of discretion." *Sobol*, 74 Va. App. at 279 (alteration in original) (quoting *Wright v. Wright*, 61 Va. App. 432, 463 (2013)).

Under Code § 20-107.3(A), property subject to equitable distribution is normally valued as of the date of the evidentiary hearing. However, upon either party's motion at least 21 days before the hearing, "the court may, for good cause shown, in order to attain the ends of justice, order that a different valuation date be used." Code § 20-107.3(A). This Court has observed that "the trial judge in evaluating marital property should select a valuation 'that will provide the

Court with the most current and accurate information available which avoids inequitable results.'" *David v. David*, 64 Va. App. 216, 224 (2015) (quoting *Gaynor v. Hird*, 11 Va. App. 588, 593 (1991)).

When denying husband's motion for reconsideration, the circuit court stated that husband had not met his burden of showing good cause for using the date of separation as an alternative valuation date. Husband did not present evidence or argument supporting his position that the date of separation was the most appropriate date. In fact, husband's own expert testified that at least some of the post-separation increase in 3Gimbals' value as of December 2020 was marital property. Accordingly, the circuit court did not abuse its discretion when it held that there was not good cause to value 3Gimbals at the date of separation, where the evidence showed that at least part of the post-separation increase in value was marital.[13]

The circuit court explained that it considered the expert valuations for the various dates provided and that it decided to use the December 2020 valuation because it was "closest to the trial date." The record shows that the latest valuation date was December 2020 and that neither party presented a more current valuation. The circuit court did not abuse its discretion when it used "the most current and accurate information available." *David*, 64 Va. App. at 224 (quoting *Gaynor*, 11 Va. App. at 593).

Contrary to husband's claims, the circuit court also did not err when it awarded wife 35% of 3Gimbals' value. In its first letter opinion, the circuit court incorrectly stated that Raymond had estimated "that between 50 to 15% of post-separation increase was marital" property, when Raymond actually had opined that that amount was between 5% and 15%. However, the circuit

---

[13] Husband also alleges that the circuit court erred in finding that husband had failed to request a specific alternative valuation date when he made that request at trial. We note that husband failed to request a specific alternative valuation date at least 21 days before the trial—as required by Code § 20-107.3(A)—and instead only moved for permission to introduce evidence of unspecified alternative valuation dates at trial.

court issued a subsequent letter opinion correcting itself, calling its initial calculations "completely inaccurate." Ultimately, the circuit court rejected Raymond's proposed calculation and awarded wife 35% of the total value of 3Gimbals.

This decision was supported by the available evidence because the circuit court found that wife's support of husband enabled him to advance in his military career and thereby obtain a high level of security clearance, which ultimately contributed to the success of 3Gimbals. While Raymond testified that it was husband's status as a service-disabled veteran and his top-secret security clearance that contributed to the business's success, the circuit court was not required to accept Raymond's opinion in its entirety or at all—and fairly considered wife's contributions to the marriage—and, as a result, her contributions to the success of the business. "The trial court has discretion to resolve conflicting expert testimony to determine an asset's value." *Howell*, 31 Va. App. at 341 (quoting *Rowe v. Rowe*, 24 Va. App. 123, 140 (1997)). "It is well established that the trier of fact ascertains [an expert] witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony." *Patel v. Patel*, 61 Va. App. 714, 728 (2013) (alteration in original) (quoting *Piatt v. Piatt*, 27 Va. App. 426, 434-35 (1998)). We therefore simply cannot say that the trial court abused its discretion when awarding wife 35% of the value of 3Gimbals.

## 2. Commingling and Transmutation of Assets

Husband further argues, "The trial court erred in its commingling and transmutation analysis."

A circuit court's classification of property "is a finding of fact that 'will not be reversed on appeal unless it is plainly wrong or without evidence to support it.'" *Price v. Peek*, 72 Va. App. 640, 647 (2020) (quoting *Ranney v. Ranney*, 45 Va. App. 17, 31-32 (2005)).

"When marital property and separate property are commingled by contributing one category of property to another, resulting in the loss of identity of the contributed property," the contributed property will be deemed transmuted to the category of the property it was commingled into. Code § 20-107.3(A)(3)(d). "However, to the extent the contributed property is retraceable by a preponderance of the evidence and was not a gift," it will retain its original classification. *Id.* "Whether a transmuted asset can be traced back to a separate property interest is determined by the circumstances of each case." *Wiese v. Wiese*, 46 Va. App. 399, 404 (2005) (quoting *von Raab v. von Raab*, 26 Va. App. 239, 248 (1997)).

Here, the evidence showed that husband commingled separate and marital assets when he deposited his separate funds, including his post-separation 3Gimbals salary, into the couple's joint bank account. Husband then withdrew large sums of funds from the marital account and transferred them to his bank account titled only in his name. Husband admitted that he paid all of the couple's bills out of that separately titled account. Husband paid for the downpayment on Unit 1535 using funds that he admitted "flowed through the joint account." Although the parties did not present direct evidence of which bank account husband used to purchase the sailboat, husband testified that he purchased the sailboat using 3Gimbals funds in February 2018. The evidence shows that husband only stopped depositing 3Gimbals funds into the jointly titled USAA checking account in the summer of 2018. Viewing the evidence in the light most favorable to wife, as we must on appeal because she prevailed below in the trial court, we hold that the trial court could reasonably infer that husband purchased the sailboat using funds from the marital account, transmuting the sailboat into marital property. *See Payne*, 77 Va. App. at 579 n.1.

Thus, the evidence supports the circuit court's finding that husband deposited separate funds into the same account as marital funds, transferred separate and marital funds from the marital

account into a separate account, paid unspecified amounts of marital bills from that separate account, and also purchased the sailboat and made the downpayment on Unit 1535 using post-separation 3Gimbals funds that he had commingled with marital funds. Based on the evidence before it, the circuit court did not abuse its discretion in holding that husband's commingling of separate and marital funds had transmuted them into marital funds.

Husband acknowledges that insufficient evidence was presented to retrace the funds, arguing that "[i]f the circuit court had questions about retracing funds, then it should have reopened the evidence." However, it was not the circuit court's burden to retrace husband's separate funds or its problem that husband did not present evidence showing the retracing at trial. Once the evidence shows that separate funds were commingled with marital funds, "[t]he party claiming a separate interest in transmuted property bears the burden of proving retraceability." *Wiese*, 46 Va. App. at 404 (quoting *von Raab*, 26 Va. App. at 248). The evidence showed that husband commingled his separate funds with marital funds, so the burden fell on him—the party seeking to establish the funds were separate—to prove their retraceability. Accordingly, the circuit court did not err by finding that some of husband's separate funds had been transmuted into marital funds.

## C. Husband's Motion to Reconsider

In his third assignment of error, husband argues, "The trial court erred by denying the Appellant's Motion for Reconsideration." He also argues that the circuit court should have given him additional time to pay the amount of money it had ordered husband to pay wife, which was "more than $3.1 million."

The equitable distribution statute gives trial courts wide latitude in determining how and when a party must pay a monetary award. *See* Code § 20-107.3(D) ("[T]he court has the power to grant a monetary award, payable either in a lump sum or over a period of time in fixed

amounts, to either party.")). Again, a circuit court's equitable distribution decision will not be disturbed unless "plainly wrong or without evidence to support it." *Howell*, 31 Va. App. 341 (citing *Blank v. Blank*, 10 Va. App. 1, 9 (1990)).

During the trial, husband repeatedly stated that he could pay "any foreseeable, reasonable" spousal support and denied any need to present evidence on his ability to pay. Although these representations concerned husband's ability to pay spousal support, his repeated claims concerning his ability to pay a large award supported the circuit court's instruction that he pay the circuit court's award of approximately $3.1 million within six months. *See Sobol*, 74 Va. App. at 272. We hold that the circuit court did not abuse its discretion when it implicitly relied on husband's earlier statements that he was financially able to make large payments when the circuit court denied husband's request for additional time to pay the circuit court's total award to wife.

D. Husband's Motion to Reopen the Evidence

In his fourth assignment of error, husband argues, "The trial court erred by denying the Appellant's Motion to Reopen the Evidence."

"Motions to reopen a hearing to take further evidence are matters within the court's discretion." *Shooltz v. Shooltz*, 27 Va. App. 264, 269 (1998). "Usually, such motions are based upon error apparent on the face of the record, or for the purpose of introducing after-discovered evidence." *Id.* (quoting *Kirn v. Bembury*, 163 Va. 891, 901 (1935)). "Virginia courts have also included among the factors to be applied in the analysis whether a party seeking rehearing had 'ample opportunity to present evidence' at the initial hearing." *Id.* at 269 n.1 (quoting *Rowe*, 24 Va. App. at 144); *see also Holmes v. Holmes*, 7 Va. App. 472, 480 (1988).

The record shows that when each party filed their equitable distribution worksheets before trial, wife listed husband's separately titled USAA account x1035, condominium Unit 1535, and the sailboat as marital property, while husband listed the same assets as his separate

property. Thus, husband was on notice that the parties disputed the classification of those assets. Husband conceded in his motion to reopen the evidence that the parties had access to the full bank statements, but chose not to introduce them into evidence nor obtain expert analysis at the time. Under those facts, the circuit court did not abuse its discretion by declining to reopen the record for additional evidence that was available to husband to present at trial.

Husband further argues that the trial court should have reopened the evidence to consider additional evidence of 3Gimbals' current financial situation. At trial, the circuit court heard testimony from husband regarding the financial challenges the company has faced since December 2020, the latest valuation date. The circuit court also heard testimony from 3Gimbals' employees expressing an optimistic view of the company's future. Husband knew the valuation of 3Gimbals was at issue and had ample opportunity to present evidence regarding its financial situation and its financial challenges—and to obtain a more current expert valuation before the trial. Consequently, we find no error in the circuit court's refusal to reopen the evidence.

### E. Wife's Assignments of Cross-Error

Wife assigns error to the circuit court's classification of husband's two NFCU accounts, the catamaran, and condominium Unit 1216 as husband's separate property. Wife argues that once the circuit court classified 3Gimbals as a completely marital asset, any assets husband acquired with funds from 3Gimbals should have also been classified as marital.

"A circuit court's classification of property . . . is a finding of fact that 'will not be reversed on appeal unless it is plainly wrong or without evidence to support it.'" *Price*, 72 Va. App. at 647 (quoting *Ranney*, 45 Va. App. at 31-32). For property acquired after the date of separation to be classified as marital property, "the party so claiming will have the burden of proving, without the benefit of a presumption, that it was acquired while some vestige of the marital partnership continued or was acquired with marital assets." *Dietz v. Dietz*, 17 Va. App.

203, 211-12 (1993). Otherwise, "property acquired after the marital partnership ended is separate property." *Id.* at 212. As such, a party's salary or other compensation earned post-separation is ordinarily considered separate property. *Sobol*, 74 Va. App. at 280. Husband earned considerable compensation post-separation from 3Gimbals as its CEO, and this post-separation compensation is his separate property.

Husband testified that he opened the NFCU accounts after the parties separated and did not transfer any funds from the joint account into his separately titled NFCU accounts. No evidence in the record contradicted husband's testimony. The evidence showed that husband took distributions as post-separation compensation from 3Gimbals and placed those distributions into NFCU account x7845 in August 2019 and that he used those separate funds to purchase condominium Unit 1216 in September 2019. Husband also used post-separation compensation/distributions from 3Gimbals to purchase the catamaran in August 2020.

Wife has not presented any evidence that the challenged assets were acquired while "some vestige of the marital partnership continued." *Dietz*, 17 Va. App. at 211-12. Neither has wife demonstrated that the specific post-separation earnings at issue were commingled with marital funds—nor that they compensated husband for services he rendered to the company during the marriage. *See Luczkovich v. Luczkovich*, 26 Va. App. 702, 710-11 (1998). In addition, husband amended his income and expense statement before trial so it more accurately reflected the post-separation distributions and compensation he received from 3Gimbals, and the circuit court considered those post-separation distributions and compensation as part of husband's income in determining spousal support.

For all of these reasons, we cannot say that the trial court was plainly wrong or without credible evidence in the record that supports its finding when it found that husband's post-separation 3Gimbals earnings (including the two NFCU accounts that he opened after the

marital separation)—along with the catamaran and condominium Unit 1216 purchased with those earnings—were his separate property.[14] *See Dietz*, 17 Va. App. at 208-13 (circuit court did not err in classifying assets that husband purchased after the couple's separation using post-separation wages as separate, not marital, property).

### F. Appellate Attorney Fees

Finally, wife requests an award of appellate attorney fees and costs expended in this appeal. The decision to award attorney fees and costs incurred on appeal is within the sound discretion of the appellate court. *See* Rule 5A:30(b)(2)(C); *O'Loughlin v. O'Loughlin*, 23 Va. App. 690, 695 (1996). "We award appellate fees only in the unusual case where the arguments on appeal are 'not fairly debatable under any reasonable construction of the record or the governing legal principles. We have no reluctance imposing fees in such circumstances.'" *Ugarte v. Ugarte*, 84 Va. App. 50, 79 (2025) (quoting *Cabral v. Cabral*, 62 Va. App. 600, 613 n.10 (2013)). Applying this standard and having thoroughly reviewed the record on appeal, we decline to award appellate attorney fees in this matter.

### III. CONCLUSION

For all of the foregoing reasons, this Court does not disturb the circuit court's judgment.

*Affirmed.*

---

[14] Husband argues that wife's assignments of cross-error are waived under the approbate and reprobate doctrine because at trial, wife listed the NFCU accounts and the catamaran as husband's separate property, and the condominium Unit 1216 as hybrid property on her equitable distribution worksheet and now argues to this Court that these assets are marital property. *See Nelson v. Commonwealth*, 71 Va. App. 397, 403 (2020) ("[A] party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory."). We do not need to reach this additional argument from husband, given that there is credible evidence in the record to support the trial court's conclusion that these assets are husband's separate property.